**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

RANDY OFFIELD,

          Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

          Defendant.

No. C04-3076-MWB

**REPORT AND RECOMMENDATION**

———————————

*TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . **2**

    A.   *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    B.   *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        1.   *Introductory facts and Offield's hearing testimony* . . . . . . . . **3**
        2.   *Cathy Courter's hearing testimony* . . . . . . . . . . . . . . . . . . . **7**
        3.   *Offield's medical history* . . . . . . . . . . . . . . . . . . . . . . . . . **9**
        4.   *Work evaluation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**
        5.   *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . . . **20**
        6.   *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

III.   *DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
      THE SUBSTANTIAL EVIDENCE STANDARD* . . . . . . . . . . . . . . . . . . . **23**

    A.   *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **23**
    B.   *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . . **26**

IV.   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

V.    *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

# I. INTRODUCTION

The plaintiff Randy Offield ("Offield") appeals a decision by an administrative law judge ("ALJ") denying his applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits. Offield claims the ALJ erred in failing to develop the record adequately by seeking an opinion from his treating psychiatrist. He further argues the record contains substantial evidence that he is disabled. (*See* Doc. No. 19)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On August 1, 2002, Offield filed applications for DI and SSI benefits, alleging a disability onset date of November 15, 1998. (R. 377-80, 555-58)[1] Offield alleged he was disabled due to reading and learning problems; "fracture to back - hurts all the time"; "severe psychological disorder"; an anxiety disorder; and dysthymia. (R. 402) He alleged he was unable to work, stating his condition interfered with his "mental ability to know what is real and not real." (*Id.*) His applications were denied initially and on reconsideration. (R. 362-67, 370-74, 559-61)

Offield requested a hearing (*see* R. 375), and a hearing was held before ALJ Andrew T. Palestini on September 24, 2003[2], in West Des Moines, Iowa. (R. 562-96) Offield was represented at the hearing by attorney Jean Mauss. Witnesses at the hearing included Offield, his girlfriend Cathy Courter, and Vocational Expert ("VE") Julie Svec.

---

[1] The hearing transcript also includes the full record from Offield's previous applications for benefits, which were filed in late 2000, and denied in 2001.

[2] The hearing transcript indicates the hearing was held in 2004. As the Commissioner notes in her brief, this appears to be a typographical error, given the dates of the ALJ's and Appeals Council's decisions. (*See* Doc. No. 20, p. 1; *compare* R. 562 & 564 *with* R. 9 & 14)

At the hearing, Offield amended his alleged disability onset date to July 16, 2002. (R. 17, R. 565)

On March 31, 2004, the ALJ ruled Offield was not entitled to benefits. (R. 14-22) Offield appealed the ALJ's ruling, and on July 27, 2004, the Appeals Council denied Offield's request for review (R. 9-11), making the ALJ's decision the final decision of the Commissioner.

On September 29, 2004, Offield filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 2) He amended his complaint on December 11, 2004. (Doc. No. 4) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Offield's claim. Offield filed a brief supporting his claim on March 22, 2005. (Doc. No. 16) He filed an amended brief on March 24, 2005. (Doc. No. 19) The Commissioner filed a responsive brief on May 6, 2005. (Doc. No. 20) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Offield's claim for benefits.

### B. Factual Background

#### 1. Introductory facts and Offield's hearing testimony

At the time of the hearing, Offield was thirty-eight years old. He was 5'10" tall and weighed 216 pounds. He was living alone in an apartment in Fort Dodge, Iowa, and he worked six to seven hours per week at Sonic Drive-In. (R. 564-67)

Offield completed the tenth grade in high school. He was in special education for all of his classes. He earned a G.E.D. in 1982. He can read and write, but stated testing indicates his reading comprehension is "at a grade school level." (R. 565-66) He is able to do basic math. (R. 566)

Offield receives food stamps. He has no health insurance and sees doctors at free clinics. (R. 566-67)

At Sonic, Offield works during the lunch rush from 12:00 p.m. to 2:00 p.m., doing prep work and making onion rings. He sometimes has to lift as much as thirty pounds, and he is on his feet all of the time. According to Offield, his boss is happy with his work, but wants him to work faster. He stated his boss tells him every day to work faster. According to Offield, he only works a couple of hours a day because that is all the hours they will give him. (R. 567-68, 584) He stated he sometimes has to leave early because he is working slowly and is "really not focused." (R. 578) According to Offield, his boss tells him to go home because his work is "just not up to the standards of [his] boss." (*Id.*)

Offield stated he sometimes hears voices that he later determines were not real. For example, at work, he will think he hears his boss saying things like, "I wish you would quit," or "I want to fire you." Offield stated it takes energy to ignore those voices, and he thinks it would be more difficult to do if he had to work longer hours. (R. 568-69) He stated he gets along with his coworkers, but he sometimes is afraid he will yell or lash out at them. (*Id.*)

The last time Offield was employed full-time was when he worked for McDonald's in 2000. (R. 569-70) He stated the job ended because "[t]he stress built up and [he] gave into the voice that was telling [him] to quit." (R. 569) Offield stated when his stress increases, the voices he hears also increase. According to Offield, he was not drinking or using other drugs when he worked at McDonald's. (R. 569-70) He lived in a halfway house and was subject to drug screenings from sometime in 1999 through January 2000. (*Id.*)

Prior to McDonald's, Offield worked for a temporary employment service. He described why that job ended as follows:

> The voices in my head told me to look at this particular
> person in a way that would cause me to have a problem on the

> job. And I, you know, listened to it and I did exactly what the
> voice told me to do. And, sure enough, I had a problem. He
> came up to me and start[ed] asking me some questions and I
> was very rude to him and I was angry and wasn't very polite.
> And the guy said that he didn't need me anymore after that.

(R. 370-71)

In 1999, Offield worked at Burger King, doing maintenance. He stated he "swept up the lot and [he] tried to fix things that were broken or needed fixing." (R. 571, 590) When asked to clarify the types of things he would fix, Offield responded, "Like light bulbs that needed changed." (R. 590) He also cleaned out duct vents and scrubbed the floors. (R. 591) During that job, he heard voices telling him to quit, and the voices finally "[won] out." (R. 571)

Offield stated he last drank alcohol in April 2004, five months before the hearing. He had been sober, but relapsed when he found out his father was going to pass away. He "was having problems with voices telling [him] to drink and [he] succumbed to it again." (R. 572) Prior to his relapse, his last drink was in mid-2002. He quit drinking on the advice of his lawyer, his therapist, and his psychiatrist. He attends Alcoholics Anonymous meetings once or twice a week, reads AA literature, and sees a counselor every two weeks for outpatient counseling. (R. 572-73) He also reads an AA meditation book that helps him. He stated he has not used any other drugs besides alcohol since mid-2002. At one point after his 2004 relapse, doctors prescribed Antabuse to assist him in not drinking, but he stated the drug was expensive and he could not afford to buy it. (R. 573)

Offield indicated he was taking too many prescription medications at one point, and the incident was resolved by doctors putting him on "a weekly planner," where he goes in once a week to get his medications. (R. 574) He stated that even when he takes his medications as prescribed and does not drink, he still has symptoms, including impulses to hurt himself and hearing voices. According to Offield, he hears voices once or twice a day whenever he is under a lot of stress or is tense about something. (R. 574-75) When

he hears the voices while at work, it is hard for him to concentrate and focus because he is fighting with the voices, trying to "shake them off." (R. 575) He is getting better at distinguishing between "real" voices and the voices he hears in his head, but he stated he cannot make the distinction reliably. (*Id.*)

Offield attempts to control the voices by going to church and taking his medications. He stated when he is unable to control the voices, he does exactly what they tell him to do. Offield stated he gets scared and feels panicky almost every day. (R. 575-76) According to Offield, the voices come whenever they "can harm and put [his] life in danger, hurt [him] in some way or another, take away something that [he] cherish[es]. Anything that can jeopardize [his] livelihood." (R. 576-77) He stated the voices are pretty quiet about three days a week. (R. 577)

Offield stated he spends most of the time at home. He stated he is uncomfortable talking with strangers, and sometimes with people he knows, but his medication makes talking to people easier. He finds it easiest to talk with his therapist, and with his girlfriend Cathy Courter. (*Id.*)

Offield stated he has problems with anger. He stated that sometimes the voices will tell him something, and it makes him mad because he does not want to listen to them. In addition, Offield stated he does not like to be alone, so his girlfriend is with him most of the time when he is not working. When he is alone, he feels like someone is listening to him. When Cathy is not with him, he tries to watch television, read, or find something else to give him comfort from "the crazy voices in [his] head." (R. 578-79) He sometimes feels his neighbors or other people are plotting against him. (R. 579)

Offield stated he fell from a balcony in 1977, and broke his back. He is supposed to do daily physical therapy, and he does it most of the time, when he feels limber enough. He still has spasms and pain in his lower back, for which he takes Vioxx. He also takes Zyprexa (an antipsychotic), Wellbutrin (an antidepressant), and Provigil (a medication used

to treat narcolepsy). (*See* www.rxlist.com for medication descriptions.) He stated he has no side effects from his medications. (R. 579-80)

Offield described his daily routine as follows. He goes to bed at about 10:30 p.m. He usually is able to fall asleep right away if he has taken his medications, and he sleeps through the night. He gets up at about 9:30 a.m., takes a shower, eats breakfast, reads his AA daily meditation book, and gets dressed. He stated he then will "try to achieve something important each day." (R. 580-81) He may make himself a sandwich for lunch. He takes out the garbage, and he and Cathy do the grocery shopping together. He goes to his counseling appointments without assistance. He enjoys playing chess, and he enjoys fishing but does not have a fishing license. (R. 581) Besides going to AA meetings and church, he does not have any social activities. (R. 582)

He used to have a driver's license, but he lost his license in 1993, apparently for an alcohol-related offense, and has not had a license since then. He stated that to get his license back, he would have to put a breath analyzer machine in his car, which he has not done. (R. 582-83)

In August 2000, a couple of years before he got sober, Offield was hospitalized in a psychiatric unit for excessive alcohol consumption. He was paranoid, feeling people were plotting against him. He stated that was when doctors started him on medication. (R. 584)

At some point in 2000, Offield received some money from an inheritance. He stated he used the money to pay off some bills and do some gambling. (R. 584)

### 2. *Cathy Courter's hearing testimony*

Cathy Courter stated she sees Offield every day. She is with him all of the time except when they are working. She works part-time at "Voc. Rehab – Iowa Central Industries." (R. 586)

Courter stated that when she goes to visit her mother, who lives about twenty-five miles from Offield's home, Offield is afraid she will not come back. His hands start fidgeting and he gets nervous. She has decided to forego visiting her mother on occasion because of Offield's reaction. (*Id.*)

According to Courter, Offield has quit drinking. She called Offield's doctor at one time because of her concern about Offield's use of prescription medications, but according to her, Offield now takes his medications as prescribed. She stated he also goes to counseling and to AA meetings. (R. 586-87)

Courter stated Offield still struggles with hearing voices. According to Courter, when Offield is hearing voices, he uses profanity a lot. If he is around a group of people, he is very quiet, has trouble sitting still, and will wring his hands. (R. 587) Courter stated Offield told her that when he was younger, the voices told him to jump off of a building or silo. More recently, Offield has told her that he "gets really uncomfortable" and "feels like just walking out" if he hears the voices at work. (R. 588) Courter is not aware of any problems Offield is having at work. (*Id.*)

Courter stated she observes Offield being agitated almost every day. According to her, Offield will twitch his lips, move around a lot, and wring his hands. She also has seen him have a panic attack, where he will have to "get out and walk around." (R. 588-89) She thinks if Offield were required to be out of the house much or to be around people, he would be very quiet. He has told her he sometimes forgets work tasks, and that people are plotting against him. (*Id.*)

In Courter's opinion, Offield has developed more healthy coping mechanisms in dealing with his drinking, but "the voices in the head are still there," and she thinks they are getting worse. (R. 589) In her opinion, it would be best for Offield to have a payee, if he were to obtain benefits. (*Id.*)

### 3.    Offield's medical history

In his brief, among other things, Offield discusses his childhood history at some length, and his mental health history during 2000 and 2001. (*See* Doc. No. 19) Although the discussion presents an enlightening look into Offield's developmental difficulties and past history, it is largely irrelevant to the present determination. Offield filed a previous claim for benefits that was denied on July 15, 2002, after Offield withdrew his request for hearing. (R. 356) As a result, the period under consideration here begins with Offield's amended alleged disability onset date of July 16, 2002. (*see* R. 17) The court will limit its examination of the record to that time period, as well as the immediately preceding several months to put Offield's condition as of July 16, 2002, in context.

The record indicates psychiatrist Uzoma C. Okoli, M.D. began treating Offield in July 1999, and has continued treating him from that point forward. (*See* R. 231-33, 234-38, 240-43, 291, 293) Offield's formal diagnoses have changed slightly over time, including psychotic disorder, depressive disorder, and substance abuse disorder. (S*ee, e.g.*, R. 315-16, 510-14, 520) In April 2002, his diagnoses were paranoid schizophrenia and depressive disorder, not otherwise specified. (R. 510) By April 16, 2002, his diagnosis was "[s]chizophrenia, paranoid type," and he has continued to carry that diagnosis. (*See* R. 509, 520)

Offield saw Dr. Okoli on March 6, 2002, for a regularly-scheduled follow-up. He complained of "extreme tiredness and sleepiness during the day," and stated he had "no motivation to look for a job." (R. 512) He claimed he was compliant with his medications and he had not been hearing voices. His medications were adjusted in an attempt to address his feeling of sedation. (*Id.*)

Dr. Okoli's office notes dated March 26, 2002, indicate Vocational Rehabilitation in Webster County was reluctant to take Offield on because they suspected he was drinking. They had requested documentation that Offield was staying clean. Dr. Okoli

could not provide such documentation, but noted Voc-Rehab could "call for a random U.A." (R. 511)

Offield saw Dr. Okoli on April 3, 2002. He stated he had been hearing voices again, off and on. He also stated he was assaulted by a neighbor, and he had a scar on the left side of his face. According to Offield, the assault was unprovoked, and he stated his hallucinations had worsened since the assault. Dr. Okoli noted Offield did not smell of alcohol and he had fair impulse control. He noted Offield did not believe people were plotting against him, and he had not taken any steps to defend himself. He was continued on Paxil, Zyprexa, and Provigil. (R. 510)

Offield returned for follow-up on April 16, 2002. He had no new complaints. He stated he was still hearing voices periodically, but the voices had not been bothering him and he had been able to control his behavior, "for the most part." (R. 509) He denied paranoid feelings. The doctor noted Offield made good eye contact, he was well-related, and he was not disheveled. His medications were continued without change. (*Id.*)

Offield cancelled his appointment with Dr. Okoli on May 14, 2002, "due to illness," and he was rescheduled for May 22, 2002. (R. 508) He saw the doctor on May 22, and stated he had "been doing better." (R. 507) He denied hearing voices or having hallucinations. He reported he had found a part-time job, working four hours a week at a local store. He denied feeling depressed and stated he had been compliant with his medications. He also denied drinking alcohol or using other drugs. The doctor noted Offield made good eye contact, he was calm and cooperative, his appearance was well-kept, and he was not fidgety or exhibiting bizarre movement or mannerisms. Offield's medications were continued without change. (*Id.*)

Webster County conducted a review of Offield's case with Dr. Okoli's office on May 30, 2002, for the purpose of determining whether Offield qualified for continued pharmacological services. Notes indicate the following:

> The patient has made some progress toward his goal to have less delusional activity. At the present the patient denies hearing voices or seeing things. The patient does seem to be well controlled. He claims to be working 4 hours weekly. Of late he reports compliance to prescribed medications. The patient denies drinking alcohol or using other illicit drugs.

(R. 506) Dr. Okoli opined Offield "would benefit from substance abuse treatment programming to improve his prognosis of abstaining from drugs and alcohol." (*Id.*) He further noted Offield had applied for disability benefits. Offield's prognosis was assessed as fair. It was noted he "may have a persistent and chronic mental illness which may always require some type of psychiatric intervention." (*Id.*)

At his next follow-up with Dr. Okoli on May 31, 2002, Offield stated he had been taking more Provigil than prescribed because he needed to be alert for work. He stated he was working at a drive-in restaurant two or three times weekly. He denied drinking alcohol or using other substances. He complained that the Zyprexa made him drowsy even though he only took it at night. Dr. Okoli warned Offield "of the risks of noncompliance and potential toxicity from overdosing on Provigil." (R. 505) He was continued on Paxil and Zyprexa, but the Provigil was discontinued, and the doctor noted Offield was not to be given further samples of Provigil. He planned to monitor Offield more closely. (*Id.*)

Offield saw Dr. Okoli on June 5, 2002, and reported better compliance with his medications. He noted his girlfriend was helping him monitor his medications, and stated he had not taken more than was prescribed. The doctor noted Offield related well during the session, had good eye contact, was not fidgety, did not exhibit bizarre movements or mannerisms, and did not smell of alcohol. However, he noted Offield's affect was constricted. He kept Offield on Paxil and Zyprexa, and restarted the Provigil. He scheduled Offield to come to the doctor's office weekly to receive his medications. (R. 504)

Offield cancelled his appointment for July 2, 2002. (R. 503) He cancelled the rescheduled appointment on July 10, 2002, stating he "had to work." (R. 502) He failed to appear for his appointment on July 22, 2002, and notes indicate he "[d]id not call to cancel or reschedule." (R. 501) When Offield next saw Dr. Okoli on July 24, 2002, he reported he had been arrested for shoplifting some beer at a local store. He denied feeling depressed or thinking about suicide, but admitted he was still hearing voices occasionally. He stated he was still compliant with his medications. The doctor noted Offield's appearance was somewhat disheveled, his mood was euthymic, and his affect was appropriate. His diagnosis continued to be "[s]chizophrenia, paranoid type." (R. 500) His medications were continued without change. (*Id.*)

Dr. Okoli saw Offield on August 21, 2002. Offield stated he "ha[d] not been completely compliant with his medications." (R. 499) He was not taking the Zyprexa three days a week so he would not be as tired at work. Offield reported he again had been caught stealing beer, and the doctor noted Offield was "trying to make a case that he stole the beer because he was noncompliant with his Zyprexa." (*Id.*) Offield denied hearing voices, feeling depressed, or having paranoid thoughts. He complained of impaired sexual function, and the doctor switched him from Paxil to Wellbutrin. Dr. Okoli noted Offield was "dressed casually in a work uniform." (*Id.*) He had fair insight and judgment and related well, but his affect was constricted. (*Id.*)

On September 1, 2002, a review of Offield's case was performed for his continued medication assistance. He was continued on a schedule of receiving his medications weekly. (R. 497-98)

On September 9, 2002, Herbert L. Notch, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (R. 469-83) and a Mental Residual Functional Capacity Assessment form. (R. 465-68) He noted Offield carried a diagnosis of paranoid schizophrenia, and opined Offield's condition would cause him moderate

limitations in restriction of the activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (R. 479) He further opined Offield would be moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal work-day and work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. (R. 465-68)

In his review summary, Dr. Notch noted Offield cares for his own needs, but has difficulty interacting with others. He can shop, drive, and make meals. He appears not to be drinking alcohol or using other illicit substances, and his symptoms are well controlled by medication. Dr. Notch found Offield's credibility to be eroded somewhat "because of his legal problems and some problems with medication compliance earlier." (R. 483) However, he noted further that Offield was "doing better at medication compliance and he is able to do simple one or two step work-like activities on a consistent basis without significant interference from his mental impairments or functional limitations." (*Id.*)

On December 28, 2002, Dee E. Wright, Ph.D. reviewed al of Dr. Notch's assessments and conclusions, and concurred in the latter's opinions. (R. 467, 469)

On September 9, 2002, Gloria West, R.N. from Dr. Okoli's office entered office notes relating to Offield's medications. She noted the doctor had ordered a change in Offield's medications from Paxil to Wellbutrin on August 21, 2002, but the change had never been initiated. The nurse then noted the following:

> I contacted phone number in [Offield's] record with message/request that he contact me. His girlfriend (Kathy)

returned call. She is aware that he has not signed release authorizing any information to be shared with her. She did however, want to share with me her concerns about [Offield] and his medications. She voiced concern that he will be upset with her for informing us about these concerns. She indicated that [Offield] has been taking all of his Provigil in one day. She added that she was taking a large pink pain pill she thinks was Darvocet and found 30 of these tab missing and believes [Offield] took them. She says [Offield] has been having more problems at work and that he has told her that voices have increased.

(R. 495) Kathy also stated she thought Offield had "gotten county assistance for filling recent prescriptions in addition to receiving medications via the weekly med planner [at Dr. Okoli's office]." (*Id.*) Kathy stated Offield would not have transportation to pick up his medications daily, if he were changed to that type of schedule. (*Id.*) The nurse planned to discuss the matter with Dr. Okoli, and she noted Offield's appointment with the doctor had been rescheduled to September 20, 2002, because he would be in court in Waterloo, Iowa, at his previously-scheduled appointment time. (*Id.*)

Nurse West discussed Offield's medications with Dr. Okoli on September 10, 2002. The doctor ordered the change from Paxil to Wellbutrin to be made immediately, and kept Offield on a weekly medication schedule. (R. 494)

Offield saw Dr. Okoli for follow-up on September 20, 2002. He stated he had been doing well and was not hearing voices, but he complained of somatic symptoms including dizziness and headaches. Offield did not believe his symptoms were due to his medications, and he opined the symptoms were "from physical problems." (R. 493) He planned to see his family doctor in a few days, and he did not want to change his medications. The doctor noted Offield was alert and oriented, without distress or delusional thoughts, and he had fair insight and judgment. He continued Offield on his current medications, despite his suggestion that Offield stop the Provigil for awhile, because Offield did not want to change his regimen. (R. 493)

14

A nursing note dated September 30, 2002, indicates Offield obtained his Provigil, as well as a voucher for a refill from Webster County Disabilities Alliance. As a result, Offield's med planner was scheduled with Wellbutrin and Zyprexa, but not Provigil. (R. 492)

Offield saw Dr. Okoli on November 11, 2002. He had no new complaints, but reported he was still hearing voices occasionally. The doctor noted Offield's thought patterns were coherent, and he was not delusional or suicidal. He continued Offield's medications without change. (R. 491)

Webster County conducted another case review of Offield's progress on November 23, 2002. Offield continued to carry a diagnosis of Schizophrenia, Paranoid Type, and his current GAF was assessed at 50-55, indicating "moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) ("DSM-IV"), at 32. Offield was maintained on a weekly medication schedule. He was reminded of the agreed-upon procedure for him to obtain his medications only from Dr. Okoli's office, and not from the county. His noncompliance had resulted in him taking more Provigil than had been prescribed. Offield stated he understood the procedure. He was scheduled for further weekly medication refills. Notes indicate there was no plan to discharge or transfer Offield from the county program. (R. 538-39)

At Offield's next appointment on December 9, 2002, he continued to report hearing voices at times. He stated he had "cut down on his drinking." (R. 537) The doctor noted Offield's impulse control was fair. He maintained Offield's medications without change. (*Id.*) Offield's condition was unchanged at his follow-up appointment on January 7, 2003.

He continued to hear voices at times, but otherwise had no new complaints. (R. 536) His medication assessment also was unchanged as of February 1, 2003. (R. 534-35)

When Offield next saw Dr. Okoli, on February 18, 2003, he stated he was not hearing voices or seeing things. He displayed fair insight and judgment, and was well-groomed. His medications were continued without change. (R. 533)

Webster County performed another case review on March 3, 2003. (R. 530-31) They noted Offield had changed the weekly day he picked up his medications to accommodate his work schedule. They observed Offield had been "willing and cooperative in providing information" to apply for medication assistance programs. They noted he had applied for disability benefits which, if granted, might make him "eligible for other/additional services or other funding that [could] assist him with med monitoring if he so wishes." (R. 531)

Offield saw Dr. Okoli on March 18, 2003. He stated he had been more depressed, and he reported "ongoing conflict with a colleague of his." (R. 532) According to Offield, he had reported the person for an alleged misdemeanor, and the person had threatened him with physical harm. He also reported some conflicts with his girlfriend, although they continued to see each other. He stated he had been feeling depressed and anxious, but he was not hearing voices and he was functioning well at work. He did not appear agitated or in distress during the examination. Dr. Okoli increased Offield's dose of Wellbutrin to address his depressive symptoms. He recommended Offield notify the police regarding the threats from his colleague. (*Id.*)

Offield next saw Dr. Okoli on April 15, 2003. He had no new complaints, and stated he was not hearing voices. He had been noncompliant with his medications "for a time period about two or three weeks ago." (R. 529) Offield "reported stealing a gun from his uncle," which he sold "to get money to pay his rent." (*Id.*) He was working six to eight hours per week at the drive-in restaurant. The doctor noted Offield was not

agitated, aggressive, or unhappy, and he was relatively well-groomed. His medications were continued without change. (R. 529)

On May 19, 2003, Offield was doing well and had not been hearing voices. His father had passed away, and Offield stated he was "coping relatively well." (R. 528) His medications were continued without change. (*Id.*)

At his appointment on June 16, 2003, Offield reported some conflict with his girlfriend over her cat, which he did not like. He denied hearing voices or seeing things. Dr. Okoli "encouraged him to rectify his conflicts with his girlfriend as amicably as possible." (R. 526) He continued Offield's medications unchanged, and noted he planned to reassess Offield more often. (*Id.*)

Offield next saw Dr. Okoli on June 30, 2003. He reported getting along with his girlfriend, for the most part. He continued to deny hearing voices or seeing things. The doctor noted Offield was "[p]oorly related," although his condition otherwise was unchanged. He was continued on his medications without change. (R. 525)

On July 2, 2003, Offield went through an intake assessment with Catholic Social Services, on a self-referral. (R. 540-43) His stated reason for seeking assistance was that a neighbor was intimidating him "and requiring him to steal and pawn." (R. 541) Offield's response was tension, frustration, physical pain, and anger, and he stated he had reached the point where he needed assistance. The social worker noted Offield "should be considered potential harm to himself and to others, circumstance contingent[.]" (*Id.*) The social worker "noted significant paranoia, flattened affect, chronic fatigue, restricted affect, adequate eye contact, oriented times four, rather inexpressive and with a hypo rate of speech, psychomotor tends toward lethargy and retardation with occasional facial tics." (R. 542) He assessed Offield's insight and judgment as impaired and poor, and his support system to be weak. He further noted Offield was in jeopardy of losing his public housing

due to a recent incident of public intoxication. (R. 543) The social worker's assessment was as follows:

> [Offield] is severely psychosocially impaired. Factors that probably should be included in the clinical assessment of the present are the following: Biological brother who is also adopted is severely psychosocially impaired, developmental child abuse, possible intermittent use of helpful medication, inadequate social supports, poverty, past history of various substances to reduce dysphoria.

(*Id.*) He diagnosed Offield with Major Depressive Disorder with psychotic features (recurrent), Schizotypal Personality Disorder, chronic (pre-morbid), and assessed Offield's current GAF at 40, indicating some impairment in reality testing or communication or major impairment in several areas such as work, family relations, and judgment. *See* DSM-IV, at 32. His treatment recommendation included weekly counseling sessions (although he noted Offield could only come in once every two weeks due to lack of funds), and treatment using Progressive Muscle Tension Reduction (PMTR) and Eye Movement Desensitization and Reprocessing (EMDR). (*Id.*)

On July 7, 2003, a social worker from New Life Associates, Inc. in Fort Dodge, Iowa, wrote a letter to the public housing agency on Offield's behalf. The social worker stated Offield was seeing him "for outpatient counseling due to an alcohol problem," and Offield would be attending AA meetings once or twice weekly with a sign-in card. Offield reported he was going to a free clinic on July 8, 2003, "to be put on monitored anibuse [sic]." (R. 544) Offield was seen at the free clinic as scheduled, and was started on Antabuse. He also was started on Vioxx to address knee and back pain. (R. 548)

Offield returned to see Dr. Okoli on July 30, 2003. He had no new complaints, and denied hearing voices. He stated he had been compliant with his medications, and had not been using illicit drugs. He reported getting into an altercation with his girlfriend in which she hit him with a can of pop, but he did not retaliate. The doctor noted Offield's thought

process was goal-directed, he had fair impulse control, and there was no indication that he posed a threat to himself or anyone else. His medications were continued without change. (R. 524)

Webster County conducted another case review on August 8, 2003. They noted Offield's prognosis was good, if he remained consistent in complying with treatment recommendations. He remained on weekly dispensing of his medications. There was no plan to discharge or transfer him from the program. (R. 522-23)

On September 10, 2003, Irene Blair, the administrator of the Webster County Disabilities Alliance, wrote a letter to Offield's attorney in response to his request for copies of medical records. Ms. Blair stated the agency could not release third-party medical records, and Offield should seek them from his individual providers. She opined Offield had struggled for most of his adult life due to mental illness that was never diagnosed or treated. She stated she had encouraged Offield to apply for disability benefits because she felt "he should qualify for the benefits." (R. 553-54)

## 4.    *Work evaluation*

In addition to evidence from medical providers, the record contains evidence of an extended work evaluation from Iowa Central Industries ("ICI"). ICI performed a work evaluation of Offield from October 1, 2001, to November 26, 2001. (R. 155-58) Offield's goal was stated as obtaining a job in the Fort Dodge area that was not physically demanding and would pay $6.00 to $7.00 per hour. During the evaluation, Offield worked half-days, and he had an attendance rate of 68%. When he was present, Offield was punctual arriving at work and returning from breaks. He wore appropriate clothing and appeared to be clean. He communicated with others clearly, did what was asked of him, and accepted correction without complaint or argument. He had no difficulty working a three-hour shift. He appeared to get along well with coworkers and to develop friendships,

although he exhibited some arguably inappropriate behavior in sitting too close to female coworkers. He demonstrated emotional control and had no temper outbursts. He stayed on task without prompting, and tried any job he was asked to do. He learned new jobs with adequate instruction, and was able to learn an eight-step job of making dog leashes. He followed safety rules, worked safely on power equipment, and consistently met quality standards. He worked somewhat slowly, with an overall productivity rating of 47%. (*Id.*)

ICI made the following recommendations from their evaluation of Offield:

1. [Offield] disqualified for a number of services beginning last spring due to an inheritance that he received. He spent this money and once again cannot afford to pay for medical services himself. He is encouraged to reapply for SSDI and also apply for help through the Disability Alliance.

2. [Offield] might consider attending an AA group in order to help him maintain his sobriety.

3. Once [Offield] demonstrates that he is ready to maintain sobriety, he would be a good candidate for the Selective Placement Program, which assists individuals in obtaining employment and initial training. [Offield] did have some success in working in the area of food service in the past. If he were to continue at this type of work he might consider working on a part-time basis. He also expressed an interest in working as a janitor.

(R. 158)

5. *Vocational expert's testimony*

The ALJ asked the VE the following hypothetical question:

[C]onsider what affect [sic] it would have on the claimant's ability to perform work activity if he was limited to simple routine repetitive work in that he would probably be best with limited interaction with the public. Short superficial inter-action with co-workers when performing his job duties. Work should not require more then [sic] basic reading and writing.

> He should not be involved in any stressful work, for example, no fast pace[d] work on a prolonged basis. Well, maybe that's easier to say no prolonged fast paced work to make it clear. No handling of complaints or emergency situations. With those limitations[,] would he be able to return to any of his past relevant work?

(R. 591-92) The VE responded the hypothetical claimant would be able to work "in the fast food industry as a fast foods worker if he was limited to working in the back say at the grill or at the fry station, things like that. The same with a kitchen helper and actually the same with the cook's helper." (R. 592) The VE indicated positions are available in those jobs that do not require a great deal of interaction with coworkers. (*Id.*)

The ALJ pointed out that Offield's boss at Sonic had given Offield a poor evaluation in the areas of appearance and relating to the public, but his boss also had noted Offield's "job was secluded so he did not have a chance to relate to the public which is why [the boss] rated it as poor." (*Id.*) The VE indicated that was the type of job he felt Offield could do, noting that "in some larger food operations like a hospital or things like that there are certain positions that do tend to be fairly isolated." (*Id.*)

The VE further opined there would be other unskilled work Offield could do, even considering his history of special education classes. The VE gave examples of laundry attendant, (4700 positions in Iowa, 235,000 nationwide), janitor (4,000 positions in Iowa, 200,000 nationwide), and poultry farm laborer (670 positions in Iowa, 38,000 nationwide). (R. 592-93)

The VE stated if Offield frequently could not complete job tasks because of interference from the voices he hears, he would be precluded from any type of competitive employment. (R. 593-94)

## 6.    The ALJ's decision

The ALJ found Offield has not engaged in substantial gainful activity since his alleged disability onset date of July 16, 2002.  (R. 18)  He noted that when Offield first filed his claim for benefits, he alleged disabling low back pain.  However, Offield has not sought treatment for his back or other physical problems since his alleged disability onset date, and in any event, medical records only show an old, healed fracture and mild degenerative changes of his lower spine.  The ALJ concluded the record evidence does not show the presence of any severe physical impairment.  (*Id.*)

The ALJ found Offield suffers from mental impairments including paranoid schizophrenia and substance abuse which, although severe, do not reach the Listing level of severity.  (R. 18-19)  He noted Offield's symptoms are controlled when he takes his medications as prescribed, and the drowsiness he experienced from his medications has been controlled by adjusting his medication regimen.  He further noted that although Offield has difficulty dealing with people, his employer has made accommodations by providing Offield with work he can perform without having to deal with the public.  (R. 20)  The ALJ found Offield's allegations of disabling impairments lack credibility, based on his "ability to work on a part-time basis, the lack of motivation noted by his father and the control of his schizophrenia that is possible with adherence to his prescribed medical regimen."  (*Id.*)

The ALJ specifically discounted Dr. Okoli's opinion that Offield's symptoms are likely to persist even if he refrains from abusing alcohol or other drugs (*see* R. 520), because the doctor's statement does not include any assessment of Offield's specific limitations.  He similarly gave little weight to social worker Irene Blair's opinion that Offield would qualify for disability benefits (*see* R. 553-54), noting Blair was not one of Offield's medical providers, she lacks the background or authority to offer such an

opinion, and her conclusion regarding Offield's disability is one that is reserved to the Commissioner. (R. 20)

The ALJ found Offield retains the following work-related capacity:

> The undersigned finds that the claimant can do simple, routine, repetitive work. He can have only limited interaction with the general public and short, superficial interaction with co-workers. He is capable of work which does not require more than basic reading and writing. He cannot tolerate prolonged stress and cannot handle complaints. With his residual functional capacity he would be capable of his past relevant work as a fast food cook, kitchen helper and cook helper.

(*Id.*) The ALJ further found that even if Offield could not return to his past relevant work, he still would be capable of performing substantial gainful activity in other jobs that exist in significant numbers in the local and national economies, including, for example, laundry attendant, janitor, and poultry farm laborer. (R. 21) Therefore, the ALJ found Offield is not disabled, and denied his claim for benefits. (R. 21-22)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is

considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in

significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### B.  The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a

preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord*

*Krogmeier,* 294 F.3d at 1022 (citing *Woolf,* 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;

4) dosage, effectiveness and side effects of medication;
5) functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).


## IV. ANALYSIS

Offield argues the ALJ erred in failing to seek Dr. Okoli's opinion regarding Offield's ability to engage in full-time, competitive employment. The ALJ discounted the doctor's opinion that Offield's symptoms are likely to persist even if he refrains from using alcohol or other drugs because, in the ALJ's view, the doctor failed to support his opinion with an assessment of Offield's specific limitations. Offield argues his case is similar to others in which the Eighth Circuit Court of Appeals has held that where a treating physician is not asked to express an opinion, the lack of such an opinion in the record does not constitute substantial evidence to support an ALJ's findings. (*See* Doc. No. 19, p. 21, citing *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000); *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2000).)

The Commissioner acknowledges the ALJ's duty to develop the record fully and fairly, but argues the ALJ did so in this case. She points out that neither Dr. Okoli nor any other physician who examined Offield ever noted any work limitations due to his mental disability. The Commissioner argues that based on the evidence of record, the ALJ properly could conclude no further evidence was necessary from Dr. Okoli. She further argues that even if the ALJ failed to develop the record fully, the decision may not be reversed for failure to develop the record because Offield has failed to show he was prejudiced by such failure. (*See* Doc. No. 20, pp. 7-9) She claims the failure of Offield's

own attorney to seek evidence from Dr. Okoli regarding Offield's work limitations "suggests that the additional evidence would be of only minor importance." (*Id.*, p. 9)

In considering an argument that an ALJ has failed to develop the record fully, the relevant inquiry is whether the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record; absent unfairness or prejudice, we will not remand." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988)); *accord Haley v. Massanari*, 258 F.3d 742, 750 (*th Cir. 2001). The *Onstad* court noted:

> While the ALJ has a duty to develop the record fully and fairly, *Driggins v. Harris*, 657 F.2d 187, 188 (8th Cir. 1981), even when a claimant has a lawyer, it is of some relevance to us that the lawyer did not obtain (or, so far as we know, try to obtain) the items that are now being complained about.

*Onstad*, 999 F.2d at 1234; *accord Scott v. Apfel*, 89 F. Supp. 2d 1066, 1076 (N.D. Iowa 2000) (Bennett, C.J.) ("[T]he question is whether medical evidence already in the record provides a sufficient basis for a decision in favor of the Commissioner.").

An ALJ need not seek additional evidence "so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). However, when additional evidence might alter the outcome of a disability determination, the ALJ has a duty to elicit such evidence. *Snead v. Barnhart*, 360 F.3d 834, 839 (8th Cir. 2004).

In the present case, the record lacks substantial evidence to make a determination that Offield is able to work full-time at any occupation. The evidence actually *suggests* the contrary, although the record does not contain substantial evidence to support either conclusion. The only support for the ALJ's conclusion that Offield's mental illness would not affect his ability to work is the opinion of a consulting physician who never examined Offield. "[T]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Kelley v. Callahan*, 133 F.3d

583, 589 (8th Cir. 1998). Dr. Okoli, Offield's treating physician, never offered an opinion of any kind regarding Offield's ability to work, and he was never asked to do so. Under similar circumstances, the Eighth Circuit has held the absence of the opinion of a claimant's primary treating psychiatrist results in the record failing to contain substantial evidence to support an ALJ's denial of benefits. *See, e.g., Smith v. Barnhart*, ___ F.3d ___, 2006 WL 224046, at *3 (8th Cir. Jan. 31 2006) ("ALJ noted no physician limited [claimant's] ability to work due to her seizure disorder. The ALJ, however, did not ask [claimant's] treating physicians whether [claimant's] seizure disorder may limit her ability to work."); *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001) ("absence of an opinion does not constitute substantial evidence supporting the ALJ's findings").

Indeed, in the present case, the only specific opinion in the record regarding Offield's ability to work is that provided by ICI, following Offield's lengthy work evaluation. ICI personnel who evaluated Offield suggested it might be appropriate for him to "consider working on a part-time basis." (R. 158)

The court finds the record does not contain substantial evidence to support the ALJ's determination that Offield is able to work. In addition, Offield's argument to the contrary notwithstanding, the court finds the record does not contain substantial evidence to support the opposite conclusion. Additional evidence from Offield's treating psychiatrist might alter the outcome of the disability determination, and the ALJ had a duty to obtain such evidence. Therefore, the court finds this case should be remanded for further proceedings with directions that the ALJ seek Dr. Okoli's opinion regarding Offield's ability to work full-time, and further develop the record as may be necessary.[3]

---

[3]For example, should Dr. Okoli's opinion result in a determination by the ALJ that Offield is completely unable to work at full-time, competitive employment, then the ALJ may need to develop the record further regarding whether Offield's abuse of alcohol or other drugs is a "contributing factor" material to the disability determination, prohibiting him from entitlement to benefits. *See* 20 C.F.R. § 416.935(b)(1); *Vester v. Barnhart*, 416 F.3d 886, 888 (8th Cir. 2005).

## V.  CONCLUSION

Therefore, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, that unless any party files objections[4] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, the Commissioner's decision be reversed, and this case be remanded for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**DATED** this 2nd day of March, 2006.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[4]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections.  *See* Fed. R. Civ. P. 72.  Failure to file timely objections may result in waiver of the right to appeal questions of fact.  *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).